PATRICK MCDONOUGH (SBN 288285)
San Diego Coastkeeper
8305 Vickers Street, Suite 209
San Diego, CA 92111
Ph: (760) 525-6838
Email: patrick@sdcoastkeeper.org

COAST LAW GROUP, LLP
MARCO A. GONZALEZ (SBN 190832)
LIVIA BORAK BEAUDIN (SBN 259434)
1140 South Coast Highway 101
Encinitas, CA 92024
Ph: (760) 942-8505
Fx: (760) 942-8515
email: marco@coastlaw.com

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO COASTKEEPER, a non-profit corporation; COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a non-profit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>NUCOR HARRIS REBAR SOUTHWEST, INC., a Delaware Corporation,<br><br>Defendant. | Civil Case No. **'23 CV 1287 WQHDEB**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*)** |

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper ("Coastkeeper") (collectively "Plaintiffs"), by and through their counsel, hereby allege:

## I.     JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201.

2.      On May 3, 2023, Plaintiffs issued a 60-day notice letter ("Notice Letter") to Nucor Harris Rebar Southwest, Inc. ("Defendant") as owner and operator of the Facility located at 12751 Vigilante Road, Lakeside, California 92040 ("Harris Rebar Facility" or "Facility"), regarding Defendant's violations of the Clean Water Act and California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ*), and *Order 2014-0057-DWQ as amended in 2015 and 2018* ("IGP"). True and correct copies of the Notice Letter and all enclosures are attached hereto as Exhibit 1 and incorporated herein.

3.      Plaintiffs also sent the Notice Letter to the registered agent for Defendant, the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the California State Water Resources Control Board ("State Board"), and the Executive Officer of the San Diego Regional Water Quality Control Board ("Regional Board") as required by 40 C.F.R. § 135.2(a)(1) and 33 U.S.C. § 1365(b)(1)(A).

4.      More than sixty (60) days have passed since the Notice Letter was served on Defendant and the State and Federal agencies. Neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This

action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

5.     Venue is proper in the Southern District of California pursuant to 33 U.S.C. § 1365(c)(1) because the source of the violations is located within this judicial district.

## II.     INTRODUCTION

6.     Plaintiffs seek relief for Defendant's substantive and procedural violations of the IGP and the CWA resulting from its activities at the Harris Rebar Facility.

7.     Specifically, Defendant has discharged and continues to discharge polluted storm water and non-storm water from the Harris Rebar Facility to downstream waters and groundwater including San Vincente Creek, San Diego River, and the Pacific Ocean (collectively "Receiving Waters") in violation of the express terms and conditions of the Clean Water Act, 33 U.S.C. §§ 1301, 1342.

8.     Defendant has also violated and continues to violate the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the IGP. These are ongoing and continuous violations of the Clean Water Act and the IGP.

9.     With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial facilities like the Harris Rebar Facility flow into storm drain systems, local tributaries, and the Receiving Waters.

10.     Among the Receiving Waters are ecologically sensitive areas providing essential habitat for dozens of fish, hundreds of birds, and numerous mammal species, as well as vital macro- and micro-invertebrate species which are an important link in the food web between the producers (leaves, algae) and higher consumers such as fish.

11.     This discharge of polluted storm water and non-storm water from the Facility causes and/or contributes to the impairment of downstream Receiving Waters and compromises or destroys their Beneficial Uses.

12.     Storm water and non-storm water contaminated with sediment, heavy metals, nutrients, and other pollutants harm the special biological significance of the

Receiving Waters. Discharges of polluted storm water and non-storm water to the Receiving Waters pose toxic, carcinogenic, and reproductive threats to the public and adversely affect the aquatic environment.

13.     The polluted discharges from the Harris Rebar Facility also harm the special aesthetic and recreational significance of the Receiving Waters for people in the surrounding communities, including Plaintiffs' members. The public's, including Coastkeeper's and CERF's members', use of the Receiving Waters for water contact recreation exposes people to toxic metals, carcinogenic chemicals, and other contaminants resulting from storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation and aesthetic enjoyment, are also impaired by polluted discharges, as such discharges cause or contribute to ecosystem and food web degradation.

**III.    PARTIES**

14.     Nucor Harris Rebar Southwest, Inc. is an active Delaware corporation and is the Owner and/or Operator of the Facility.

15.     Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its main office in San Diego, California. Coastkeeper is committed to protecting and restoring the San Diego region's water quality and supply. A member of the international Waterkeeper Alliance, San Diego Coastkeeper's main purpose is to preserve, enhance, and protect San Diego's inland waters and watersheds, marine sanctuaries, coastal estuaries, wetlands and bays.

16.     Plaintiff CERF is a non-profit public benefit corporation organized under the laws of the State of California with its office located in Encinitas, California. CERF was founded by surfers in North San Diego County and is active throughout California's coastal communities. CERF was established to advocate for the protection and enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

17.     Many of Plaintiffs' members live and/or recreate in and around the

Receiving Waters. Plaintiffs' members use and enjoy the Receiving Waters to fish, sail, boat, kayak, paddleboard, surf, swim, hike, view wildlife and scenery, and engage in scientific studies and restoration efforts, among other activities.

18. Defendant's failure to comply with the procedural and substantive requirements of the IGP and the CWA results in discharges of polluted storm water to the Receiving Waters. Defendant's polluted discharges degrade water quality and harm aquatic life in the Receiving Waters and thus impair Plaintiffs' members' use and enjoyment of those waters.

19. Defendant's failure to comply with the procedural monitoring and reporting requirements of the IGP and the CWA results in harm to Plaintiffs and their members. The monitoring and reporting requirements in the IGP serve the public's substantive interest in clean water and the environment. Defendant's failure to report creates a genuine threat of undetected past or future polluted discharge, harming Plaintiffs' members' aesthetic, educational, and recreational interests.

20. Plaintiffs' members have an interest in accurate information about Defendant's discharges in order to further their aesthetic, educational, scientific, recreational, and journalistic interests.

21. The violations of the IGP and CWA at the Harris Rebar Facility are ongoing and continuous. Thus, the interests of Plaintiffs' members have been and will continue to be adversely affected by Defendant's failure to comply with the IGP and the CWA.

22. The relief sought herein will redress the harm to Plaintiffs' members caused by Defendant's activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which they have no other plain, speedy, or adequate remedy at law.

23. An actual controversy exists as to the rights and other legal relations between Defendant and Plaintiffs.

/././

/././

## IV.      LEGAL BACKGROUND

### A.      The Clean Water Act.

24.     The CWA requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1).

25.     Section 301(a) of the Clean Water Act prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA.

26.     "Waters of the United States" are defined as "navigable waters" and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

27.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

28.     The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters. *See* 40 C.F.R. § 122.2.

29.     The CWA requires all point source dischargers, including those discharging polluted storm water, achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 33 U.S.C. § 1311(b); 40 C.F.R. §125.3(a)(2)(ii)–(iii).

### B.      California's IGP.

30.     Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. It allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water.

31.     California is a state authorized by the EPA to issue NPDES permits. In

California, the State Board is charged with regulating pollutants to protect California's water resources. Cal. Water Code § 13001.

32. The IGP is a statewide general NPDES permit issued by the State Board pursuant to Section 402 that regulates the discharge of pollutants from industrial sites.

33. Between 1997 and June 30, 2015, the IGP in effect was *Order No. 97-03-DWQ* ("1997 Permit"). On July 1, 2015, pursuant to *Order No. 2014-0057-DWQ* ("2015 Permit"), the reissued 2015 IGP took effect. The 2015 Permit supersedes the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit. On July 1, 2020, pursuant to *Order 2014-0057-DWQ as amended in 2015 and 2018* ("2020 Permit"), the reissued 2020 IGP took effect.

34. In order to discharge storm water lawfully in California, certain industrial dischargers must secure coverage under the IGP and comply with its terms or obtain and comply with an individual NPDES permit. 2015 & 2020 Permits § I.A.12; Prior to beginning industrial operations, dischargers are required to apply for coverage under the IGP by submitting a Notice of Intent to Comply with the IGP ("NOI") to the State Board. *Id*. § I.A.17.

35. Industrial activities covered under the IGP are described in Attachment A of the Permit. Facilities with SIC codes 20XX through 39XX require coverage by the Permit. *Id*., Attachment A.

36. Violations of the IGP are violations of the Clean Water Act. *Id*. § XXI.A.

**C.     The IGP Discharge Prohibitions.**

37. The IGP contains certain absolute prohibitions. "All discharges of storm water to waters of the United States are prohibited except as specifically authorized by this General Permit or another NPDES permit." *Id*. § III.A.

38. The Discharge Prohibitions forbid the direct or indirect discharge of liquids or materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. *Id*. § III.B.

39. These provisions further prohibit storm water discharges and authorized

non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance. *Id*. § III.C.

40.     The IGP prohibits discharges that violate any discharge prohibitions contained in local Water Quality Control Plans ("Basin Plan") or statewide water quality control plans and policies. *Id*. § III.D.

41.     The San Diego Basin Plan prohibits "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives." Basin Plan at 4-20.

42.     Accordingly, where the discharge does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 Permits.

**D.      The IGP Effluent Limitations.**

43.     The IGP Effluent Limitation requires permittees to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of BAT and BCT. 2015 & 2020 Permits § V.A.

44.     Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include chemical oxygen demand ("COD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, nitrate + nitrite nitrogen ("N+N"), iron, phosphorus, enterococcus, and fecal coliform, among others.

45.     Dischargers must develop and implement Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 2015 & 2020 Permits § V.A.

46.     EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"). The 2015 MSGP went into effect on June 4, 2015, and the 2021 MSGP went into effect on March 1, 2021. The Benchmarks provide a

relevant and objective standard to determine whether a facility's BMPs are effectively developed and implemented to achieve compliance with BAT/BCT standards. *See* 2015 and 2021 MSGPs, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); 86 Fed. Reg. 10,269; *see also* 2015 MSGP Fact Sheet at 52; 2021 MSGP Fact Sheet at 78.

47. Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914 (C.D. Cal. 2009).

48. Failure to develop or implement BMPs that constitute BAT and BCT is an IGP violation. 33 U.S.C. § 1311(b); 2015 & 2020 Permits § V.A.

49. The 2015 MSGP freshwater EPA Benchmarks include but are not limited to: 100 mg/L for TSS; 15 mg/L for Oil and Grease; pH is 6.0−9.0 s.u; .68 mg/L for N+N; .014 mg/L for copper; .082 mg/L for lead; .12 mg/L for zinc; 0.75 mg/L for aluminum; and 1.0 mg/L for iron. 2015 MSGP Fact Sheet at 55−56.

50. The 2021 MSGP freshwater EPA Benchmarks include but are not limited to: 100 mg/L for TSS; 15 mg/L for Oil and Grease; pH is 6.0−9.0 s.u; .68 mg/L for N+N; .00519 mg/L for copper; .082 mg/L for lead; 1.1 mg/L for aluminum; and .12 mg/L for zinc. 2021 MSGP Fact Sheet at 80−81.

**E.     The IGP Receiving Water Limitations.**

51. The IGP Receiving Water Limitation prohibits storm water discharges and authorized non-storm water discharges from adversely impacting human health or the environment. 2015 & 2020 Permits § VI.B.

52. Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the IGP's Receiving Water Limitations. *Id.*

53. The IGP Receiving Water Limitation prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

*Id.* § VI.A.

54. Water quality standards ("WQSs") consist of both "designated uses" for a body of water and a set of "criteria" specifying the maximum concentration of pollutants that may be present in the water without impairing its suitability for designated uses. 33 U.S.C. § 1313(c)(2)(A).

55. WQSs applicable to dischargers covered by the IGP include, but are not limited to, those set out in the Basin Plan, and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38. Both the CTR and Basin Plan WQSs must be attained at the point of discharge.

56. The Basin Plan identifies designated "Beneficial Uses" for water bodies in the San Diego region under Clean Water Act Section 303. 40 C.F.R. § 131.

57. The Beneficial Uses for the San Vicente Creek downstream from the Facility's include: municipal and industrial water supply, water contact and non-contact water recreation, warm freshwater habitat, and wildlife habitat. Basin Plan, Table 2-2.

58. The Beneficial Uses for the Lower San Diego River include: agricultural and industrial water supply, water contact and non-contact water recreation, warm freshwater habitat, wildlife habitat, preservation of biological habitats of special significance, and rare, threatened, or endangered species. *Id.*, Table 2-2.

59. Surface waters that cannot support their Beneficial Uses are designated "impaired" water bodies pursuant to Section 303(d) of the Clean Water Act.

60. According to the 2020/2022 303(d) List, San Vicente Creek is impaired for ammonia as nitrogen, indicator bacteria, phosphorus, total nitrogen as N, and toxicity.

61. According to the 2020/2022 303(d) List, the Lower San Diego River is impaired for benthic community effects, bifenthrin, chlordane, chloride, color, cyfluthrin, cypermethrin, indicator bacteria, nitrogen, dissolved oxygen, permethrin, phosphorus, pyrethroids, total dissolved solids ("TDS"), toxicity, and turbidity.

62. Polluted discharges from industrial facilities, such as the Harris Rebar Facility, contribute to the degradation of these already-impaired surface waters, as well as

aquatic-dependent wildlife.

63.     The following WQS are established by the Basin Plan for San Vicente Creek and Lower San Diego River:  nitrogen, 1.0 mg/L; phosphorus, 0.1 mg/L; iron, 0.3 mg/L; pH "shall not be depressed below 6.5 or raised above 8.5." Basin Plan at 3-21; 3-46-48.

64.     The CTR includes numeric criteria set to protect human health and the environment. Based on 100mg/L hardness, the CTR maximum freshwater concentrations include: copper, 0.013 mg/L; lead, 0.065 mg/L; zinc, 0.12 mg/L. 40 C.F.R. § 131.38.

65.     Because the IGP Receiving Water Limitation prohibits discharges that cause or contribute to an exceedance of any applicable WQS, discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQSs, absent any authorized mixing or dilution zone, are violations of Receiving Water Limitations of the IGP. *See* 2015 & 2020 Permits § VI.A.

**F.     The IGP Storm Water Pollution Prevention Plan Requirements.**

66.     Prior to beginning industrial activities, dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). *Id*. §§ X.A−B.

67.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. *Id*. § X.

68.     The SWPPP must include, among other things: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm

water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; a description of individuals and their current responsibilities for developing and implementing the SWPPP, and a Monitoring Implementation Plan. *Id.* §§ X.A–I.

69.     Dischargers must evaluate their SWPPP at least annually and revise it as necessary to ensure compliance with the IGP. 2015 Permit §§ I.J.55, X.A.9, X.B.1; 2020 Permit §§ I.K.69, X.A.9, X.B.1. The IGP require dischargers to certify and submit via the Storm Water Multiple Application & Report Tracking System ("SMARTS") database their SWPPP within 30 days whenever the SWPPP contains significant revisions. 2015 & 2020 Permits § X.B.2.

70.     The IGP requires dischargers to conduct an annual comprehensive site compliance evaluation that includes, *inter alia*, a review of all visual observation records, sampling and analysis results, and a review and evaluation of all BMPs. *Id.* § XV.

**G.     The IGP Monitoring and Reporting Requirements.**

71.     Permittees must develop and implement a monitoring implementation plan ("MIP"). *Id.* §§ X.I, XI. The MIP objectives are to ensure BMPs have been adequately developed, implemented, and revised, and confirm compliance with the IGP's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 2015 Permit §§ I.J.55–56, X.I, XI; 2020 Permit §§ X.I, X, I.K.69–70.

72.     The MIP thus aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. 2015 Permit § XX.B; 2015 Permit Fact Sheet § J at 43; 2020 Permit Fact Sheet § J at 138.

73.     Permittees must conduct monthly visual observations of storm water discharges, storm water drainage areas, and for the presence of unauthorized non-storm water discharges. 2015 & 2020 Permits § XI.A.1.

74.     A qualifying storm event ("QSE") is a precipitation event that produces a

discharge for at least one drainage area and is preceded by forty-eight (48) hours with no discharge from any drainage area. *Id*. § XI.B.1.

75.    The Reporting Year is defined as July 1 through June 30. 2015 Permit § I.M.62.b; 2020 Permit § I.N.76.b. Permittees must collect and analyze storm water samples from two (2) QSEs within the first half of each Reporting Year (July 1 to December 31), and two (2) QSEs within the second half of each Reporting Year (January 1 to June 30). *Id*. § XI.B.2.

76.    Permittees must submit all sampling and analytical results for all samples via the SMARTS database within thirty days of obtaining the results. *Id*. § XI.B.11.

77.    Permittees must analyze samples for TSS, O&G, and pH, at a minimum. *Id*. § XI.B.6.a–b.

78.    Permittees must analyze samples for other pollutants likely to be present in significant quantities in the storm water discharged from the facility that serve as indicators of the presence of all industrial pollutants. *Id*. § XI.B.6.c.

79.    Permittees must analyze storm water samples for all applicable parameters required by the Facility's SIC code, as set forth in Table 1 of the IGP. *Id*. § XI.B.6.d.

80.    Permittees must analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved Total Maximum Daily Loads. *Id*. § XI.B.6.e.

81.    Permittees must submit an annual report to the applicable Regional Board by July 15 of each year. The Annual report must include a (1) Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the 2015 Permit, (2) an explanation for any non-compliance of requirements within the Reporting Year (3) an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the Reporting Year, and (4) the date(s) of the Annual Evaluation.

82.    All reports, certifications, or other information required by the Permit or requested by a regional board are signed by an authorized facility and certified for

1    accuracy. *Id*. § XXI.K.

2    **V.    FACTUAL BACKGROUND**

3         **A.    Facility Site Information, Industrial Activities, and Pollutant Sources.**

4         83.    The SMARTS database indicates the Harris Rebar Facility first obtained

5    IGP coverage to conduct industrial operations on February 23, 2011, under Waste

6    Discharge Identification Number 9 37I023030.

7         84.    The Facility's 2015 NOI lists the Facility's Standard Industrial Classification

8    ("SIC") code as 3449 (Miscellaneous Structural Metal Work).

9         85.    According to the 2022 SWPPP, the industrial activities conducted onsite

10   include cutting and bending metal material; equipment maintenance, fueling, and

11   cleaning; material loading/loading; and trailer storage.

12        86.    According to the 2022 site map, the site consists of a main office,

13   maintenance area, hazardous material area, storage and work space, loading and

14   unloading area, waste management storage, and a portable toilet.

15        87.    A County of San Diego Department of Public Work Stormwater Inspection

16   conducted on February 16, 2021 states that Harris Rebar cuts and bends rebar in the

17   northern area of the Facility, that rebar is stored throughout the northern portion of the

18   site, that solid hazardous waste is stored in 55 gallon drums located on the northeast

19   corner of the site, and that spare materials are stored in shipping containers on the

20   southern portion of lot.

21        88.    Industrial activities and materials are located throughout the Facility.

22        89.    According to Harris Rebar's 2015 NOI and 2022 SWPPP, the Facility is

23   comprised of either 3.3 or 3.5 acres, 30 percent of which is impervious.

24        90.    Direct observations, photographs, publicly available imagery, and other

25   information indicates that more than 30 percent of the Facility is impervious.

26        91.    Direct observations and images, as well as the Facility's own site map,

27   indicate the surface beneath the gantry cranes and production area consists of a large

28   concrete pad, with no berm or curb, and that almost the entire eastern half of the Facility is

paved with asphalt. As such, approximately half of the Facility's surface is impervious.

92.

93.     The 2022 SWPPP's pollutant source assessment identifies only metals, coiled wires, oil & grease, fuel, and coolants as significant materials that may be source of contaminants and identifies TSS, O&G, pH, and iron as the only potential pollutants associated with these materials.

94.     The 2022 SWPPP BMP summary table also includes aluminum, N+N, and zinc as potential pollutants associated with "metal." SWPPP, p. 27.

95.     The Industrial General Permit also requires facilities with the SIC code of 3449 to analyze their storm water samples for N+N, aluminum, iron, and zinc, in addition to the minimum parameters. 2020 Permit, § XI.B.6, Table 1.

96.     A storm water sample collected by Coastkeeper representative from the Facility's driveway at Discharge Point 1 on December 14, 2021 showed the Facility's storm water discharges exceeded applicable water quality standards and/or EPA benchmarks for numerous parameters, including copper, zinc, iron, pH, TSS, and phosphorus. Additionally, the data disclosed the presence of lead and N+N notwithstanding the Facility's failure to identify these potential pollutants at the Facility. *See*, Exhibit 1.

97.     The EPA Industrial Stormwater Fact Sheet for Sector AA industrial activities indicates that pollutants associated with the Facility's industrial activities and materials include steel scraps, aluminum scraps, brass, copper, dust, chips and borings, steel scale, Teflon, manganese, paint wastes, thinner, varnish, heavy metals, spent chlorinated solvents, aluminum, lead, zinc, copper, iron, oxide, oil, nickel, cadmium, chromium, and many more.[1]

---

[1] U.S. EPA, *Industrial Stormwater Fact Sheet Series, Sector AA: Fabricated Metal Products Manufacturing Facilities* (Feb. 2021), https://www.epa.gov/sites/production/files/2015-10/documents/sector_aa_fabmetal.pdf;

98.    Information available to the Plaintiffs, including their experience engaging with facilities with similar industrial activities and industrial materials, indicates the Facility regularly discharges all of these pollutants, including high concentrations of phosphorus, iron, copper, zinc, and TSS.

99.    The Facility SWPPP has failed and continues to fail to identify all pollutants associated with its industrial activities and materials.

100.    Industrial activities occur, and industrial materials are handled, at various locations throughout the Harris Rebar Facility either outdoors without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and/or without adequate secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the Facility.

101.    Many pollutants associated with industrial activities occurring at the Facility regularly escape via spills, dust emissions, wind dispersion, vehicle track out, or otherwise, resulting in pollutant dispersal throughout the Facility.

102.    Pollutants associated with the Facility's industrial activities have and continue to be tracked by vehicles, foot traffic, and dispersed via wind and storm water throughout the entire site, and on and off the Facility through ingress and egress.

103.    According to the 2022 SWPPP, the three-acre Facility is divided into two drainage areas: Drainage Area 1 and Drainage Area 2.

104.    The SWPPP and site map indicate Drainage Area 1 slopes west and storm water flows westward, but both fail to identify a discharge point for Drainage Area 1.

105.    A 2021 San Diego County Department of Public Works inspection report states that the Facility discharges from the northwest corner of the Facility.

106.    A Facility site map dated March 2021 labels the northwest corner of the Facility as a discharge point, "DP#2."

---

*see also*, https://www.epa.gov/system/files/documents/2022-02/metal-manufacturing-and-fabrication_508.pdf *EPA Metal Manufacturing and Fabrication Toxic Release Inventory Factsheet*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES     15

107.   Direct observations and photographs from January 2023 of the slope, western retaining wall, erosion pathways, and the placement of filter socks and waddles indicate that DP#2 continues to be a point where storm water is discharged from the Facility.

108.   Plaintiffs' direct observations indicate that Drainage Area 1 also discharges from the far western point of the Facility.

109.   According to the 2022 SWPPP and site map Drainage Area 2 consists of the remainder of the property to the north, south, and east. The 2022 Facility Map purports that the entirety of Drainage Area 2 discharges at one point near the main entrance to the southeast. Two pooling areas are noted on the Facility's 2021 site map, one east of the office, and one immediately inside the facility driveway, but these are not indicated on the updated 2022 map.

110.   Plaintiffs' direct observations and photographs from January 2023 indicate the Facility discharges from numerous additional points around the perimeter. Storm water escapes via at least two large gaps at the foot of the Facility's eastern boundary wall.

111.   Information available to Plaintiffs, including Coastkeeper representative visual observations of the Facility, indicates storm water discharges from the Facility's entire northern boundary.

112.   The northern and western edges of concrete pad underlying the gantry crane and manufacturing area are lined with filter socks, indicating that storm water from this area sheet flows north and west.

113.   Coastkeeper representatives directly observed large gaps at the far southern point of the Facility's boundary wall, and three other large gaps at the foot of the wall along the Facility's southern boundary, each with erosion pathways, indicating that there are at least four additional discharge locations along the Facility's southern boundary.

114.   All discharges from the Facility flow into the County of San Diego's Municipal Separate Storm Sewer System ("MS4"), and thereafter into San Vicente

Creek, the San Diego River, and eventually to the Pacific Ocean.

115.   San Vicente Creek flows south until its confluence with the San Diego River, which eventually flows to the Pacific Ocean.

116.   One or more regulated industrial activities are conducted at locations throughout the entire Facility, and thus the entire Facility requires IGP coverage.

117.   BMPs or other controls do not adequately separate the storm water flows from portions of the Facility where non-regulated activities may occur from storm water flows from the regulated industrial activities and thus all discharges from the Facility are regulated under the IGP.

118.   Industrial activities at the Harris Rebar Facility generate significant amounts of numerous pollutants. During rain events, these pollutants are washed off surfaces throughout the facility and into storm water discharge points, which flow to Receiving Waters.

119.   Defendant has failed and continues to fail to develop and/or implement required BMPs to prevent discharges of all non-storm water in violation of the IGP and the CWA.

120.   Defendant has discharged and continues to discharge polluted storm water and non-storm water from the Facility in violation of the IGP.

121.   The Harris Rebar Facility's polluted discharges have caused and/or contributed, and continue to cause and/or contribute, to the impairment of water quality in Receiving Waters in violation of the IGP.

122.   Elevated levels of numerous pollutants have resulted in the inability of Receiving Waters to support their Beneficial Uses.

123.   The illegal discharges of polluted storm water and non-storm water from the Harris Rebar Facility impact Plaintiffs' members' use and enjoyment of the Receiving Waters by degrading the quality of those waters, and by posing risks to human health and aquatic life.

**B.    The Harris Rebar Facility Discharges Contaminated Storm Water in**

Violation of the IGP.

124.   With every significant rain event, the Harris Rebar Facility discharges polluted storm water via storm drainage systems into the Receiving Waters.

125.   The Receiving Waters into which the Defendant discharges polluted storm water are waters of the United States and therefore the IGP properly regulates discharges to those waters.

126.   Storm water and non-storm water discharges from the Harris Rebar Facility violate the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations of the IGP.

## 1. Discharges of Polluted Storm Water from the Harris Rebar Facility Violate IGP Discharge Prohibitions.

127.   The Harris Rebar Facility has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of IGP. *See* 2015 & 2020 Permits § III.C.

128.   The California Water Code defines "contamination" as "an impairment of the quality of the waters of the state by waste to a degree which creates a hazard to the public health through poisoning or through the spread of disease."

129.   "Pollution" is defined as "an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects . . . [t]he waters for beneficial uses."

130.   Plaintiffs' monitoring data of the Facility's storm water discharge demonstrates the Facility has discharged, and continues to discharge, extremely high concentrations of pH, iron, zinc, copper, phosphorus, and TSS in excess of various water quality objectives, benchmarks, and other standards which were promulgated to protect human health and the environment, as well as the Beneficial Uses of Receiving Waters. This violates Discharge Prohibition III.C of the IGP.

131.   The Facility has discharged and continues to discharge unauthorized

NSWDs in violation of Discharge Prohibition III.B of the IGP.

132.   The SWPPP fails to address what becomes of the waters used to clean and rinse equipment, cranes, forklifts, the facility, and vehicles. It further neglects to explain how these waters are kept from co-mingling with storm water.

133.   The SWPPP acknowledges that spills of fluids such as O&G and coolants can result in unauthorized NSWDs at the Facility. SWPPP, p. 14. While the SWPPP claims that BMPs to address NSWDs are identified in Section 3 of the SWPPP, the SWPPP fails to identify a single site-specific BMP with any particularity. Thus, the Facility Owners and/or Operators have failed to identify all NSWDs and to develop and/or implement BMPs that would prevent these NSWDs from comingling and/or discharging from the Facility, in violation of the Industrial General Permit. *See* 2015 & 2020 Permits § III.B.

134.   Defendant has violated and continues to violate Discharge Prohibition III.D of the Permit by discharging pollutants in excess of water quality objectives listed in the San Diego Basin Plan, and other "statewide water quality control plans" such as the CTR.

135.   Waste Discharge Prohibition number 5 of the San Diego Basin Plan states, "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited."

136.   "Waste" is defined as, "waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation," which includes discharges of pollutants in storm water. California Water Code, § 13050(d).

137.   Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 IGP.

138.   No express allowance for dilution has been granted to the Harris Rebar Facility's discharges or to the downstream Receiving Waters.

139.   Plaintiffs' monitoring data, evidencing numerous instances of extremely

1   high pH, iron, zinc, copper, phosphorus, and TSS, demonstrate Defendant has violated

2   and continues to violate Discharge Prohibition III.D IGP by discharging pollutants far in

3   excess of water quality objectives listed in the San Diego Basin Plan, and other

4   "statewide water quality control plans" such as the CTR.

5       140.   Each time the Harris Rebar Facility discharges polluted storm water or non-

6   storm water in violation of Sections III.B–III.D of the Discharge Prohibitions provisions

7   of the IGP is a separate and distinct violation of the IGP and Section 301(a) of the Clean

8   Water Act, 33 U.S.C. § 1311(a).

9       141.   These Discharge Prohibition violations are ongoing and will continue every

10  time the Facility discharges polluted storm water and non-storm water without

11  developing and/or implementing BMPs that prevent such discharges.

12      142.   The Facility has been in violation of these Discharge Prohibitions since May

13  3, 2018, and is subject to civil penalties for all violations of the Clean Water Act

14  occurring since that time. *See* Ex. 1 (setting forth dates of all precipitation events during

15  the past five years).

16      **2.   Discharges of Polluted Storm Water from the Harris Rebar Facility**

17      **Violate IGP Effluent Limitations.**

18      143.   Defendant has failed and continues to fail to develop and/or implement

19  BMPs as required to achieve compliance with the BAT/BCT standards to prevent the

20  discharge of polluted storm water from the Facility. *See* 2015 & 2020 Permits § V.A.

21      144.   Plaintiffs' storm water monitoring data demonstrates that the Facility's

22  storm water discharges exceed the EPA benchmarks for pH, copper, zinc, and TSS. For

23  example, on December 14, 2021, the Facility discharged concentrations of pH at 9.04

24  s.u., exceeding the benchmark range of 6.0-9.0 s.u.; copper at .029 mg/L, nearly six times

25  the benchmark of .00519 mg/L; zinc at .248 mg/L, over double the benchmark of 0.12

26  mg/L; and TSS at 372 mg/L, over triple the benchmark of 100 mg/L. Ex. 1.

27      145.   Additionally, direct observations and County of San Diego inspection

28  documents indicate the Facility has failed to identify and/or adequately implement BMPs

in compliance with BAT/BCT standards.

146.   Because the Facility has failed to adequately identify all its discharge points, curbs, berms, and/or other barriers have not been sufficiently implemented to adequately manage storm water flows and discharge locations.

147.   Each time Defendant discharges polluted storm water in violation of Effluent Limitation V.A of the 2015 and 2020 Permits is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

148.   These effluent limitation violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards.

149.   The Facility has been in violation of these Effluent Limitations since May 3, 2018, and is subject to civil penalties for all violations of the Clean Water Act occurring since that time. Ex. 1 (setting forth dates of all precipitation events during the past five years).

### 3. Discharges of Polluted Storm Water from the Harris Rebar Facility Violate IGP Receiving Water Limitations.

150.   The Harris Rebar Facility has violated and continues to violate IGP Receiving Water Limitations.

151.   Plaintiffs' storm water monitoring data demonstrates that the Facility has discharged numerous pollutants in excess of various applicable WQS, thus violating the permit's Receiving Water Limitations. This data reveals that the Facility regularly discharges iron, phosphorus, and pH in excess of respective Basin Plan water quality objectives, and copper and zinc in excess of CTR standards. *See* Ex. 1.

152.   Defendant has never sampled its discharges, and thus the Facility likely discharges other pollutants in concentrations exceeding applicable Basin Plan water quality objectives and CTR criteria.

153.   Receiving Waters of the Lower San Diego River are impaired, and thus

unable to support designated Beneficial Uses.

154.   The December 2021 sample results demonstrate the Facility's storm water discharges contained phosphorus concentration of 0.46 mg/L, exceeding the Basin Plan Water Quality Objectives of 0.1 mg/L.

155.   As such, the Facility's discharges cause and/or contribute to the phosphorus impairments of the Receiving Waters.

156.   The Facility produces metal shavings and dust through its fabrication activities, and stores large quantities of rebar and steel outdoors, exposed to storm water. The Facility's regular discharges of extremely high concentrations of iron and other metals in excess of the Basin Plan objective cause and/or contribute to the impairment of the Receiving Waters.

157.   A principal cause of discoloration in water is the discharge of rusted metals. These metals in water result in discoloration ranging from yellow, orange, red, brown, and black.

158.   The Facility's regular discharges of extremely high concentrations of iron and other metals in excess of the Basin Plan objective cause and/or contribute to the color impairment of the Receiving Waters.

159.   The Lower San Diego River and San Vicente Creek are likewise impaired for toxicity. Copper and zinc are toxic pollutants in aquatic environments, and limitations on these substances are specifically enumerated in the CTR. 40 C.F.R. § 131.38.

160.   Plaintiffs' monitoring data demonstrates the Facility's discharges of copper and zinc far in excess of CTR criteria. Therefore, the Facility's polluted discharges cause and/or contribute to the toxicity impairment of the River and Creek.

161.   Furthermore, the Facility has never analyzed its storm water samples for lead, chromium, copper, manganese, or nickel even though they are pollutants commonly associated with metal fabrication. Defendant also likely discharges high concentrations of these other toxic metals, further causing and/or contributing to the River's toxicity impairment.

162.   Dissolved metals impact the concentration of TDS in the Receiving Waters. As such, the Facility's significant discharges of multiple metals, as evidenced by the high levels of iron, zinc, and copper in its storm water discharges, indicates the Facility also causes and/or contributes to the San Diego River's TDS impairment.

163.   The Lower San Diego River is also impaired for turbidity and benthic community effects.

164.   Plaintiffs' sampling data demonstrates high levels of TSS in excess of the IGP NAL and EPA Benchmark.

165.   High turbidity is closely associated with TSS values. The San Diego Basin Plan mandates that "[w]aters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses." Basin Plan at 3-32. "Suspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can clog fish gills and interfere with respiration in aquatic fauna. They also screen out light, hindering photosynthesis and normal aquatic plant growth and development." Id. at 3-31.

166.   As such, the Facility's polluted discharges cause and/or contribute to the San Diego River's TDS and benthic community effects impairments.

167.   The Basin Plan and CTR are applicable WQSs under the Industrial General Permit.

168.   Therefore, the Facility's frequent and ongoing storm water discharges containing concentrations of multiple pollutants in excess of applicable WQSs, such as zinc, copper, pH, iron, TSS, and phosphorus, which cause and/or contribute to respective impairments of Receiving Waters, violate the Receiving Water Limitations of the Industrial General Permit. 2015 & 2020 Permits § VI.A; Basin Plan, p. 3-31.

169.   Discharges of elevated concentrations of pollutants in the Facility's storm water also adversely impact human health and threaten to cause pollution or a public nuisance in violation of violations of the Receiving Water Limitation VI.B-C.

170.   Each time Defendant discharges polluted storm water in violation of the

IGP's Receiving Water Limitations is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

171.   The Facility's discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the IGP's Receiving Water Limitations.

172.   The Facility has been in violation since May 3, 2018, and Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

**C.     Defendant Has Violated and Continues to Violate IGP SWPPP Requirements.**

173.   Defendant has conducted and continues to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP.

174.   The Facility Owners and/or Operators have conducted and continue to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP. The SWPPP and site map fail to accurately reflect all drainage areas, discharge points, and flow direction as required by Section X.E of the Permit.

175.   The site map fails to identify storm water flow patterns for the north, northeast, and southwest portions of the Facility. Further, the SWPPP and site map identify only one discharge point for the entire Facility and fail to provide any discharge locations for DA1. The Facility discharges storm water from multiple other points around its perimeter, including the northeast corner, western-most point, southern-most point, and multiple locations along the east, north, and south walls, none of which are identified or acknowledged in the SWPPP or site map.

176.   The site map also fails to identify where materials are directly exposed to rain, outdoor covered areas, places where spills/leaks have occurred, fuel & fueling areas, vehicle parking and equipment storage areas, shipping & receiving areas, waste treatment/disposal areas, cleaning areas, material handling and processing areas, and dust & particulate generating areas in violation of Sections X.E.3.e and X.E.3.f of the

Industrial General Permit.

177.   The Facility SWPPP's pollutant source assessment fails to adequately describe all industrial activities, materials, and potential pollutant sources in violation of the Industrial General Permit § X.C, § X. F, and § X.G.

178.   Despite metal cutting being a principal activity onsite, the SWPPP fails to identify the metal shavings, dust, and tailings generated by cutting or grinding as a potential pollutant.

179.   The SWPPP does not identify any BMPs to contain and dispose of dust or prevent their exposure and/or mobilization by storm water and NSWD.

180.   The Facility has also neglected to identify the potential pollutants present in its cutting fluids, cleaning fluids, lubricants, degreasers, coolants, and paint or primer, if any, just as it has failed to specify what pollutants are present in the hazardous materials stored in the 55-gallon drums onsite. *See*, Ex. 1.

181.   Failure to identify all potential pollutants at the Facility is a violation of Sections X.A and § X.G of the Permit.

182.   Further, the pollutant source assessment fails to identify numerous pollutants associated with the Facility's industrial activities. A storm water sample collected from the Facility's driveway revealed high levels of copper, zinc, iron, pH, TSS, and phosphorus, as well as the presence of lead and N+N.

183.   The EPA's industrial stormwater fact sheet for fabricated metal products manufacturing facilities indicates that pollutants associated with facilities such as Harris Rebar include aluminum, lead, zinc, copper, iron, oxide, nickel, manganese, cadmium, chromium, solvents, lubricants, sand, pH, N+N, carbon, phosphates, borates, oily sludge, hydrofluoric acid, oil, organics, fuels, TSS, hydraulic oil, diesel fuel, gasoline, and others. Defendant's failure to identify even a fraction of these pollutants is an ongoing violation of the Permit.

184.   Defendant has failed and continues to fail to develop and/or implement a SWPPP that contains BMPs to adequately prevent the exposure of pollutants to storm

water, the comingling of non-storm water with storm water, and the subsequent discharge of pollutants from the Facility, in violation of the IGP.

185.   The BMPs set forth in the Facility's SWPPP are merely the general headings of BMP categories set forth in the Permit. The SWPPP includes only copies of over 70 pages of the California Stormwater BMP Handbook without selecting or tailoring any facility-specific control measures, as is required in violation of Section X.H of the Permit.

186.   Direct observations and photographs from January 2023 verify that the Facility lacks even minimum BMPs. There are multiple non-designated discharge points along the Facility's perimeter, many of which have no BMPs in place. Large coils of rebar were observed sitting directly on the ground along the northern boundary of the Facility, and raw materials were stored throughout the Facility without any cover.

187.   The County of San Diego Stormwater Inspection conducted on February 6, 2021 found the Facility's BMPs were inadequate, most notably that its materials were not properly stored, and required corrective action, such as "berms, dikes, or other diversion structures or other measures… ."

188.   A storm water sample collected by the Plaintiffs contained pollutants that far exceed WQSs and/or EPA Benchmarks.

189.   Thus, the Facility's BMPs have failed and continue to fail to adequately (1) minimize pollutant exposure to storm water at the Facility; (2) control and minimize polluted runoff from the Facility; (3) treat and remove pollutants in storm water prior to discharge; (4) prevent or control contaminated storm water from being discharged from the Facility; and/or (5) prevent or control contaminated NSWDs from being discharged from the Facility, all of which violate the Industrial General Permit.

190.   Defendant has also failed to revise the Facility's SWPPP to ensure compliance with the IGP. Any significant revisions to the SWPPP must be maintained onsite and uploaded to SMARTS within thirty days of the revision. 2015 & 2020 Permits, § X.B.

191.   Every day the Facility operates with an inadequately developed and/or

implemented SWPPP, and/or with an improperly revised SWPPP is a separate and distinct violation of the IGP and the Clean Water Act.

192.   Defendant has been in daily and continuous violation of the IGP's SWPPP requirements since at least May 3, 2018. Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

**D.      Defendant Has Failed to Develop, Implement, and/or Revise Adequate Monitoring Implementation Plan at the Harris Rebar Facility.**

193.   Defendant has conducted and continues to conduct operations at the Facility with an inadequately developed, implemented, and/or revised MIP.

194.   Defendant has failed and continues to fail to collect the required number of storm water samples for each reporting period. Since 2015, Defendant has failed to collect a single storm water sample.

195.   Though the Facility's Annual Reports claim no other rain events occurred, NOAA precipitation data belie these claims, and establish that over the past five years, there were hundreds of days on which precipitation occurred at or near the Facility.

196.   Coastkeeper collected a sample from the Facility's driveway in December 2021 after only about 30 minutes of rain caused a discharge.

197.   A County inspection conducted on February 16, 2021 noted that no samples had been collected for the past year and specifically recommended the Owner and/or Operator review the Industrial General Permit sampling requirements in Section XI.B, and yet Harris Rebar still has not collected a single storm water sample. Defendant has failed to sample any rain events during the 2022–2023 reporting period, a year of record-breaking precipitation.

198.   Defendant has failed and continues to fail to develop and/or implement a MIP that provides for the collection of storm water samples "from each drainage area at all discharge locations" at the Facility in violation of IGP. *See* 2015 & 2020 Permits § XI.B.4.

199.   While Section XI.C.4 of the Permit allow permittees to reduce the number of

locations to be sampled, there is no indication the Facility Owners and/or Operators have complied with the requirements of Section XI.C.4 to justify sampling a reduced number of discharge locations at the Facility.

200.   The SWPPP states that there is only one discharge point at the property, however, as discussed *supra*, extensive evidence indicates storm water is discharged at numerous points along the Facility's boundary.

201.   Each location where storm water runs off the property must be treated as a separate discharge point requiring monitoring and testing.

202.   Defendant has failed and continues to fail to sample and analyze storm water discharges for all parameters required by the IGP.

203.   The Facility fails to analyze samples for parameters that would serve as indicators for all industrial pollutants onsite. *See* 2015 & 2020 Permits § XI.B.6.c. The Permit requires Structural Metal Work facilities to test for zinc, N+N, iron, and aluminum. Defendant has neglected to test for any of these pollutants in violation of the Permit.

204.   The EPA has determined that pollutants associated with Harris Rebar's industrial activities include aluminum, lead, zinc, copper, iron, oxide, nickel, manganese, cadmium, chromium, solvents, lubricants, sand, pH, N+N, carbon, phosphates, borates, oily sludge, hydrofluoric acid, oil, organics, fuels, TSS, hydraulic oil, diesel fuel, gasoline, and others. Defendant has failed to include the majority of such pollutants in its pollutant source assessment and MIP.

205.   Defendant has failed to test for pollutants related to the impairments of the Receiving Waters or approved Total Maximum Daily Loads in violation of Section XI.B.6.e of the Permit. The Lower San Diego River is impaired for color, TDS, toxicity, and turbidity. The Facility must therefore test for pollutants that may contribute to these impairments, such as metals that affect water discoloration through rust, metals affecting toxicity (such as lead, chromium, copper, nickel, and others), and TDS.

206.   Based on the Facility's violation of Discharge Prohibitions, Effluent

Limitations, and Receiving Water Limitations, and failure to collect the required number of storm water samples, Defendant fails to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

207.   Every day the Facility operates with an inadequately developed and/or implemented MIP, or with an improperly revised MIP is a separate and distinct violation of the IGP and the Clean Water Act.

208.   Defendant has been in daily and continuous violation of the IGP's MIP requirements since at least May 3, 2018. These violations are ongoing, and Defendant is subject to civil penalties for all violations of the IGP and Clean Water Act occurring since that time.

**E.    Defendant Has Violated the IGP's Reporting Requirements.**

209.   Defendant has failed and continues to fail to comply with the IGP's reporting requirements.

210.   Harris Rebar failed to submit an annual report for 2017/2018 and 2018/2019 in violation of Section XVI of the Permit.

211.   In each Annual Report, the Facility Owner and/or Operator must certify that: (1) a complete Annual Comprehensive Site Compliance Evaluation was conducted as required by the IGP; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the IGP, or will otherwise be revised to achieve compliance.

212.   Defendant's annual reports are certified attesting to the Facility's compliance with the terms of the IGP. These certifications are erroneous. Defendant has violated, and continues to violate, numerous provisions of the IGP.

213.   For example, the annual reports for 2021/2022, 2020/2021, and 2019/2020 claim that no QSEs generated a discharge between July 1, 2019 and June 30, 2022, despite NOAA data to the contrary, and Coastkeeper collecting a sample during this time period.

214.   The Facility's Legally Responsible Person knew or should have known the

Facility failed to comply with numerous procedural and substantive provisions of the IGP, and thus certifications of these annual reports were erroneous.

215.   Every day Defendant conducts operations at the Facility without reporting as required by the IGP is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

216.   Defendant has been in daily and continuous violation of the IGP's reporting requirements every day since at least May 3, 2018. These violations are ongoing and Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

217.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

218.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## V.     CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the IGP's Discharge Prohibitions and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

219.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

220.   Defendant has discharged and continues to discharge unauthorized non-storm water in violation of Section III.B of the IGP.

221.   Defendant has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Section III.C of the IGP.

222.   Defendant has discharged and continues to discharge numerous pollutants in

excess of water quality objectives listed in the Basin Plan in violation of Section III.D of the IGP.

223.   Defendant has been in violation of the IGP Discharge Prohibitions at the Facility every day from May 3, 2018, to the present. Defendant's violations of the IGP Discharge Prohibitions are ongoing and continuous.

224.   Each and every violation of the IGP Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 3, 2018, to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SECOND CAUSE OF ACTION

### Discharges of Contaminated Storm Water in Violation of the IGP's Effluent Limitations and the Clean Water Act.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

225.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

226.   Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities from discharging through implementation of BMPs that achieve BAT/BCT at the Facility.

227.   Discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards occur every time storm water discharges from the Facility.

228.   Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the IGP and the CWA. *See* 2015 & 2020 Permits § V.A; *see also* 33 U.S.C. § 1311(b).

229.   Defendant violated and continues to violate the IGP Effluent Limitations each time storm water containing levels of pollutants that do not achieve BAT/BCT

standards discharges from the Facility.

230.   Defendant has been in violation of the IGP Effluent Limitations at the Facility every day from May 3, 2018, to the present. Defendant's violations of the IGP Effluent Limitations and the CWA are ongoing and continuous. Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop and/or implement BMPs to achieve BAT/BCT at the Facility.

231.   Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

232.   Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since May 3, 2018. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## THIRD CAUSE OF ACTION
### Discharges of Contaminated Storm Water in Violation of IGP Receiving Water Limitations and the Clean Water Act.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

233.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

234.   The Facility discharges storm water containing levels of pollutants that adversely impact human health and/or the environment.

235.   Defendant discharges storm water containing levels of pollutants that cause or contribute to exceedances of WQSs from the Facility.

236.   Discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

237.   Discharges of storm water containing levels of pollutants that cause or contribute to exceedances of WQSs occur each time storm water discharges from the Facility.

238.   Defendant's discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs, are violations of the IGP and the Clean Water Act. 2015 & 2020 Permits §§ VI.A–B; 33 U.S.C. § 1311(b).

239.   Defendant violated and will continue to violate the IGP Receiving Water Limitations every time storm water containing levels of pollutants that adversely impact human health or the environment, or that cause or contribute to exceedances of WQSs discharge from the Facility.

240.   Defendant has been in violation of the IGP Receiving Water Limitations at the Facility every day from May 3, 2018, to the present. Defendant's violations of the IGP Receiving Water Limitations and the CWA are ongoing and continuous.

241.   Defendant will continue to be in violation of the IGP and the CWA each time storm water containing levels of pollutants that adversely impact human health or the environment, or that causes or contributes to exceedances of WQSs is discharged from the Facility.

242.   Each day that Defendant has discharged and/or continues to discharge polluted storm water from the Facility in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

243.   Defendant has been in violation of the IGP Receiving Water Limitations every day since May 3, 2018. By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA since May 3, 2018. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## FOURTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and/or Revise the Facility's Storm Water Pollution Prevention Plans in Violation of the IGP and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

244.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

245.   Defendant has failed and continues to fail to develop and/or implement adequate SWPPPs for the Facility.

246.   Defendant has failed and continues to fail to adequately revise the SWPPP for the Facility.

247.   Defendant conducts operations at the Facility each day without an adequately developed, implemented, and/or revised SWPPP. Defendant's failure to adequately develop, implement, and/or revise SWPPPs for the Facility is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § X; *see also* 33 U.S.C. § 1311(b).

248.   Defendant has been in violation of the IGP SWPPP requirements at the Facility every day from May 3, 2018, to the present. Defendant's violations of the IGP SWPPP requirements and the CWA at the Facility are ongoing and continuous.

249.   Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop, implement, and revise the Facility SWPPP.

250.   Each day Defendant operates the Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since May 3, 2018. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## FIFTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and Revise Adequate Monitoring Implementation Plan in Violation of the IGP and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

251.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

252. Defendant has failed and continues to fail to develop and/or implement an adequate MIP for the Facility. Defendant operates the Facility each day without an adequately developed, implemented, and/or revised MIP.

253. Defendant's failure to adequately develop, implement, and/or revise the MIP for the Facility is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § XI; *see also* 33 U.S.C. § 1311(b).

254. Defendant has been in violation of the IGP MIP requirements every day from May 3, 2018, to the present. Defendant's violations of the IGP MIP requirements and the CWA at the Facility are ongoing and continuous.

255. Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to adequately develop, implement, and/or revise the Facility MIP.

256. Each day that Defendant operates the Facility without developing, implementing, and/or revising an adequate MIP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since May 3. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

/./.

/./.

/./.

## SIXTH CAUSE OF ACTION

**Failure to Report as Required in Violation of the IGP and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

257. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

258. Defendant has failed and continues to fail to submit accurate and/or complete Annual Reports for the Facility.

259.   Defendant's failure to submit complete and accurate Annual Reports is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § XVI; *see also* 33 U.S.C. § 1311(b).

260.   Defendant conducts operations at the Facility each day without reporting as required by the IGP. Defendant has been in violation of the IGP's reporting requirements every day since at least May 3, 2018. Defendant's violations of the reporting requirements of the IGP and the CWA are ongoing and continuous.

261.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP reporting requirements at the Facility.

262.   Each and every violation of the IGP reporting requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since May 3, 2018. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SEVENTH CAUSE OF ACTION

### Failure to Properly Monitor in Violation of the IGP.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

263.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

264.   Defendant has failed and continues to fail to conduct the requisite visual observations of storm water discharges at the Facility in violation of the IGP and the CWA. *See* 2015 & 2020 Permits § XI.A; *see also* 33 U.S.C. § 1311(b).

265.   Defendant has failed and continues to fail to collect and analyze the required number of storm water samples at the Facility in violation of the IGP and the CWA. 2015 Permit & 2020 Permits §§ XI.B.1–3; 33 U.S.C. § 1311(b).

266.   Defendant has failed and continues to fail to analyze all collected samples for all required parameters in violation of the IGP and the CWA. *See* 2015 & 2020 Permits § XI.B.6; *see also* 33 U.S.C. § 1311(b).

267.   Defendant has failed and continues to fail to collect storm water samples "from each drainage area at all discharge locations" at the Facility in violation of IGP and CWA. *See* 2015 & 2020 Permits § XI.B.4; *see also* 33 U.S.C. § 1311(b).

268.   Defendant has failed and continues to fail to comply with the IGP's monitoring requirements at the Facility since May 3, 2018. Defendant's violations of the IGP monitoring requirements and the Clean Water Act are ongoing and continuous.

269.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP's monitoring requirements.

270.   Each and every violation of the IGP's monitoring requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since May 3, 2018. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

WHEREFORE, Plaintiffs pray judgment against Defendant as set forth hereafter.

## VI.   RELIEF REQUESTED

271.   Plaintiffs respectfully request that this Court grant the following relief:

a.   A court order declaring the Defendant to have violated and to be in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to comply with discharge prohibitions, effluent limitations which include BAT/BCT requirements, and receiving water limitations, and for failing to comply with the other substantive and procedural requirements of the IGP as set forth within this Complaint;

b.   A court order enjoining Defendant from discharging pollutants from the Facility to surface waters in violation of the Clean Water Act and IGP;

c.   A court order requiring Defendant to implement affirmative injunctive measures designed to eliminate Defendant's violations of the substantive and procedural requirements of the IGP and the Clean Water Act;

d.     A court order assessing civil monetary penalties for each violation of the CWA at $64,618 per day per violation for violations that are assessed after January 6, 2023, as permitted by CWA Section 309(d), 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, and 40 C.F.R. § 19.4.

e.     A court order awarding Plaintiffs their reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

f.     Any other relief as this Court may deem appropriate.

Dated: July 12, 2023

Respectfully submitted,

COAST LAW GROUP LLP
By: s/Livia B. Beaudin
LIVIA B. BEAUDIN
Attorney for Plaintiffs
COASTAL ENVIRONMENTAL
RIGHTS FOUNDATION
E-mail: livia@coastlawgroup.com

SAN DIEGO COASTKEEPER
By: s/Patrick McDonough
PATRICK MCDONOUGH
Attorney for Plaintiffs
SAN DIEGO COASTKEEPER
E-mail: patrick@sdcoastkeeper.org